Good morning, everyone. We're here today for oral argument. We are going to begin with Appeal 24-2254, SEC et al. v. Duff et al. We'll begin with oral argument from the appellant, Mr. is it DeVoot? DeVoot. DeVoot. Thank you. May it please the court, yes. Good morning, your honors. My name is Andrew DeVoot, and I represent Shatar, the appellant, in this case. Your honor, Equity Build, this is the second time that Equity Build's fraud has come before this court. A fraud perpetrated over the course of nearly a decade that had more than hundreds of victims carried about professional liars, robbing them of tens of millions of dollars. In fact, as this court specifically found, Equity Build's purpose business model was to obfuscate and mislead when it came to ownership and responsibility for property. Against this backdrop, your honor, this morning, given the timing, I'd like to focus on two specific issues. The first is the district court's determination that Shatar, once on inquiry notice, through a diligent inquiry, would have learned certain facts that would let it to learn that there were other individual investors who already had mortgages on the two properties, Yates and Indiana, such that Shatar did not have priority, despite having recorded its mortgages some three months before the individual investors' mortgages were recorded. Your honors, we know, for Shatar disputes, it does inquiry notice. But we know that the district court erred with respect to its determination on a diligent inquiry and what would have been found. Because the three suppositions the district court makes on pages 32 and 35, there's three key points in terms of what would have been found by a diligent inquiry or be lied by the extraordinary facts actually in this case. Specifically the first on page 32 is that if Mr. Namvar from Shatar would have asked for proof that the loan on the Yates property had been paid off, that he would have been provided information demonstrating there were individual investors with that loan and that there were no rollover documents. But your honors, we know we don't have to speculate that that's not what would have happened here. This court on the Group 1 appeal specifically noted that when faced with this exact problem, competing secured interests, Equity Build created false payoff letters with respect to Group 1 properties, indicating that another investor's loans had been used. So there's no speculation here as to what would have happened. We know that had they were asked a question about proof of paying off the loan on Yates, that what would have been provided would have been false documents. The SEC tells us that as well. Counsel, did you make this argument below to the extent that you're making it here? Your honor, we absolutely not. We made the argument in terms of inquiry notice. What exactly? Spell out for me below what your argument was on inquiry notice. Because I don't recall this specifically that you're saying here today. So on document 1587, pages 7 through 11, we set out the framework for inquiry notice. And your honor, this is a staggered briefing in this case with different filings. And in a reply briefing, respond to the idea that they were on inquiry notice and specifically say that Shatara was not on inquiry notice as to either property. And even if they had been, that any inquiry on the title search index would not have revealed that there are these prior mortgages. I think the key point, your honor, is that on page 29 of the district court's opinion, the district court disagreed with what we considered would be the scope of the title search that would take place in inquiry notice. The district court specifically citing an Inouye County collector in other cases says in stump that it can go beyond and what it would look at for inquiry notice and whether or not there would have been facts discovered on diligent inquiry. We disagreed with that scope. But now on appeal, we're focusing on the points the district court made as to why it thought what a diligent inquiry would have found. So we absolutely made the inquiry notice argument. Respectfully, I did not anticipate the district court would suggest going to equity bill for the very reason that our four contacts, the Coens, Mr. DeRue, and Mr. Mora, they're all fraudsters. And that's not Shatara saying that. That's the SEC. That's the receiver's counsel. The receiver's counsel sued Mr. DeRue for his involvement in this fraud. And just this summer, Mr. Mora, the receiver, implored the district court that he should not receive any proceeds from any sales because of his active involvement in the fraud. So on appeal, we are addressing what the district court said it believes would have been found on a diligent inquiry. But we absolutely did not anticipate that it would have suggested that was a part of the diligent inquiry. And so there is no waiver, Your Honor. And it's simply addressing the court's reasoning. The second supposition the district court made was if Mr. Nambar would have talked to the investors, it would have found out the individual investors, there were other mortgages. But the problem with that, again, is Mr. Nambar didn't know that there were these individual investors, that they existed, or who they were. And that's by design in this fraud. In every other context of this case, the receiver, the individual investors, are all more than But counsel, one of the principals, if I'm not mistaken, sent an email saying they had become aware of the business structure, and that raised some red flags. They certainly could have asked for the contact information for the individual investors. They could have done, they could have followed up on that notice. I mean, your client undercuts the argument a little bit when they specifically say, hey, we're on notice here. We're concerned. I mean, that's not a quote, obviously, but we're concerned about this business structure. Give us more information. Sure. Your Honor, I think there are two steps. One, it's really important to separate, and I appreciate the question, separating out into the two parts of the analysis. In terms of, to your point on inquiry notice, and whether they were on notice, we respectfully submit they were not, given their understanding that there would be purchased loan mortgages, or in this instance, when Yates switched from what they thought it was going to be, they understood there were those. And in fact, the record demonstrates that other entities were also interested in the different properties. So the idea that there'd be another buyer. But your Honor, for this morning's purposes, even if this court determines they were on inquiry notice, the fundamental, the most important problem, not for just this case, but from a doctrinal standpoint, if this court were to find that in this case with these fraudsters, once a party's on inquiry notice, it's an objective assessment, and U.S. Bank v. Villasenor, the Illinois Appellate Court, it's a 2012 First District case cited in our brief, it doesn't matter what Mr. Nambar did or didn't do in the second part, it's an objective assessment. And that's for good reason. Because no one's going to get off the hook here. Even if Shatar has priority, all of these arguments, they go to the fraudulent conveyance point, and whether or not this specific party acted in good faith. And that has been stayed, pending this priority determination. So I think it's very important. This court can require a district court for every future Illinois investor found on inquiry notice, setting aside Mr. Nambar and Shatar, to make sure that the actual facts matter as to what would have been found. And your Honors, that's why the bonded financial case that is referenced in Brandt v. Horseshoe, the two cases we cite, and then the first independence case in the Sixth Circuit, really matter. This court, in both those cases, looked at the facts matter in Bonded when Bonded Financial sent the $200,000 transfer to European American Bank for Mr. Ryan, who ended up in prison because he was a fraudster. The Quiz Court noted, if European Bank would have called Bonded Financial, what would Bonded Financial have said? This is absolutely authorized. And we're not talking about- But Counsel, isn't there some evidence in the record that the 30 v. 6, Mr. Nambar dropped the ball on some inquiries, that there was going to be a call, can you call me ASAP? And then the record's unclear as to what happened. To me, that shows a lack of diligence and following up on what were red flags. Thank you for the question. Two points. One, I think actually, Mr. Nambar testified credibly that six years, seven months, and 16 days is when he was deposed. He was deposed on Halloween, that's what I remember. And he sent that email on March 15th. He said, I don't remember if we had the call or not. He didn't say, I'm not saying it didn't happen. He testified under oath he didn't remember. But Your Honor, most importantly, even if this court, for all those reasons, finds he was on inquiry notice, U.S. Bank v. Villasenor specifically says, what the party did doesn't matter. It becomes about the objective. That is the crux of this case. Mr. DeVote, question about the Ponzi scheme presumption. Yes, Your Honor. District Court and Equity Bill 1 both agreed that the Coens ran a Ponzi scheme and explained why. Why is that not enough to apply the Ponzi scheme presumption in this case? Yes, Your Honor. I think, for us, it just boils down to a matter of two points. One, when you look at the Indiana transaction, it is the epitome of not, for what we know now, fraudulent conveyance discovery was stayed, but the money went from equity, excuse me, from Shatar to a third party to actually purchase the property. Receivership wouldn't even have the proceeds to distribute to anyone had Shatar not provided that money. But the real point, Your Honor, is that looking, and I understand it's not controlling, but the District Court case management in Utah, just talking about when you're at the priority stage and you're not at the fraudulent conveyance stage, just the notion of an individualized determination. And with that, Your Honor, I would respectfully request to reserve the balance of my time for discussion. Very good. Thank you, Mr. DeVote. The remainder of your time will be reserved. We'll now move to argument on behalf of the appellee from Mr. Stein. Good morning. May it please the Court. I'm Max Stein, one of the attorneys representing the certain individual investors. I am here once again representing a group of individual investors who made investments, usually from their retirement savings, with Equity Build, that Equity Build used to buy and rehabilitate properties in Chicago. Like the prior appeal in this case involving the District Court's rulings regarding priority, this appeal concerns which of two competing sets of priority claims will have higher priority. One, the claims of my clients and the other individual investors who had mortgages or were promised mortgages when they made their investments. And two, on the other hand, the claims of Chattar that it makes based on a loan it's made after one of the loans had closed from our investors' monies and that was used to refinance that loan and the purchase of the second property. While much of what has happened in the appeal before the Court today is like what happened in the prior appeal, we recognize that that decision does not decide today's case. But like the District Court noted, quote, applying the law to a similar set of facts will garner a similar result, and we submit that's exactly what should happen here today. The facts here are similar, though different. First, the liens involved here are not simply mortgage liens. There is an equitable lien here. We submit that the District Court appropriately and properly determined that the circumstances here justified entry or allowing of an equitable lien, and it is that lien that has priority over Chattar's claims. And second, the facts are different regarding the due diligence that was done by Chattar as the institutional lender. And that's because it's an entirely different institutional lender who did entirely different due diligence. But those differences don't change anything. In fact, as the Court's questions have already noted, what Chattar did here was woefully insufficient due diligence. There's been a lot of focus on the question of inquiry notice. This is inquired notice. They knew everything. They asked the right questions, and they ignored the answers. Chattar is here today saying, speaking out of both sides of its mouth, by the way, it says this isn't a Ponzi scheme for purposes of presumption, but you've got to look at these people. They're fraudsters, clear fraudsters. And it says these fraudsters would never have told us the truth. Well, the record reflects these fraudsters did tell them the truth. Is it in the record that Namvar has been convicted of a Ponzi scheme? Yes, Your Honor. That was part of the record submitted to the District Court, and it's in our brief, page six, in a footnote. And that's also relevant, I would suggest, Your Honor. Chattar today says that setting aside Mr. Namvar and Chattar, and then says there's no facts that could have been determined through inquiry notice. Well, Chattar definitely wants to set aside what Chattar did here, because Chattar screwed this up. They asked the right questions, they got the answers that would have answered those questions, and they ignored them. Mr. Namvar testified that, yes, he did ask for lots of information about their business model. What did Equity Bill do? Did they lie and obfuscate? No. They sent him the documents that each one of my clients received and each one of my clients signed. Were they samples? Yes. Were they identical to what was actually provided? Also, yes. What did Chattar and Mr. Namvar do with that? Nothing. They ignored them. They did not read them. Mr. Namvar testified, why would I read them? I was going to use different loan documents. Well, that's an irrelevancy. The point here is, could Mr. Namvar and Chattar have known that there were existing loans and existing liens? Had it looked at those documents? The answer to that question is yes, it absolutely could have. What Chattar is trying to do is create a world in which what Chattar did doesn't matter. Instead, it should all be about what would a reasonable person learn? A reasonable person would have learned exactly what Chattar could have learned. It just willfully chose not to learn it. The law has long held that you cannot be an ostrich. You cannot stick your head in the sand and expect to be okay. That's exactly what happened here. In fact, if Chattar's arguments were accepted today, it would set a standard where you're better off doing worse due diligence. That's because what Chattar argues is we're not like the people in Group 1 who relied on a fraudulent release. We never even asked for a release. We shouldn't be held to a standard where we would have gotten something that we would have relied on and been lied to. That makes no sense. That's the best way to end up with people doing little to no due diligence, which I would submit is exactly what Chattar did here, and then asking the courts to save them from their own mistakes. Because that's not the way the law is set up, and because that's not the way that the district court's opinion here should be affirmed. I want to point, I want to touch on just one last thing, which is the standard of review here. This is an equitable receivership in which the challenge is not to any of the law that was applied here. Chattar's challenge today is really about how the facts get applied here. That is... How the law applies to the facts. Thank you. I screwed that up. Thank you. No problem. That is subject to an abuse of discretion standard here. There is nothing close to evidence in the record of any abuse of discretion by the district court. To the contrary, every look at the record, every look at what Chattar actually did confirms that the district court correctly held that the priority here should go to the individual investors and not to Chattar. Mr. Stein, a question about appellate jurisdiction. Sure. I'll be posing a similar question to Mr. Devote. We have Equity Bill 1. We've got the concurrence that raises this question. Waste management does not have a... Or wealth management does not have a lengthy treatment of that question. This is a huge piece of litigation. We're on step two of what could end up being many steps. It's always incumbent upon us to address that and look into that. Your thoughts on appellate jurisdiction? I'm going to leave most of this to receivers' counsel, but I will observe from my perspective as an attorney representing a group of individuals who were the victims of a Ponzi scheme that the idea that was adhered to in the first opinion in this case and that comes from wealth management is absolutely vital in a large case like this because what doing these appeals in sequence allows is when one of these groups is resolved and the appeal is resolved, the money gets distributed. If we were to instead wait until the very end of all of this, what we would be doing is effectively taking away from the district court one of its tools for effectively managing its docket and requiring the district court to get through all the way through everything before anything gets removed. But efficiency can't overcome the rightness or wrongness of jurisdiction, so maybe you want to speak to that. That's the point I'm going to leave to Mr. Bradford, but I do want to emphasize the efficiency point because these are final decisions. I guess I will sort of answer your question, not just dodge it. These are final decisions because what would come from the adherence to the order that was entered by the district court is the distribution of the funds, and that order under wealth management does allow for appellate jurisdiction, and so we would submit that that's what should be followed again. And for all of the reasons I just mentioned regarding efficiency, including the fact that if you wait until the very end, so let's say the appeal of group one had gone the other way, that would have informed the district court of the new rules of the road, which would then be applied to the rest of the receivership. It would be much more efficient for that to happen at the front end than for it to happen at the back end and have to go all the way back to the beginning and go through all ten groups before you get to the end. Thank you, Mr. Stein. We'll now move to argument on behalf of the appellee, Mr. Rachlis. May it please the Court. I'm Michael Rachlis, along with Jody Rosenwein. We represent the receiver in this action. My comments are going to be directed primarily to the issues, the narrow issues that have been brought to the distribution plan that are part of SHATAR's appeal. But I will, some of this, I'll go directly to some of the questions that have been asked here, including, I'll start with appellate jurisdiction. We believe under 1291, the concurrence does affirm largely, raises the question about which circuits deal with the questions of jurisdiction, but ultimately between wealth management and Equity Bill 1 provides the proper, we believe the proper jurisdictional basis for this appeal. The rights of each group have been completed at the time that the Court has approved a distribution plan for these separate groups. That's what happened in Group 1. That's what's happened here in Group 2 as to the SHATAR plaintiffs. I understand the inertia argument, and certainly that was a concurrence, not a dissent in Equity Bill 1. But do you want to speak to whether this is a merits decision or not? Well, ultimately, it does, the ending of the groups does ultimately address the rights of those claimants. That is part of why this falls under the traditional collateral order doctrine type of case law. So I think that is true. The idea somehow, Your Honor, that there's going to be a flood of additional appeals, if that is the concern, is not true here in the sense that there is only one group left, and that is after the SHATAR group, there's Group 10. The matters have been resolved in the district court level. So the one thing that remains outside of Group 2, and this one claimant in Group 2, is the unsecured claimant. So there will be a distribution plan for all unsecured creditors, and that is the last step for the case. So the idea somehow that there's been a lot of work before the district court on the other groups that have been identified. So the concerns that are raised about this being interlocutory, one, I believe that it is consistent with wealth management and Judge Easterbrook's concurrence in equity bill, one, and the jurisdictional basis for it, but two, the idea somehow that it's being undermined by a whole host of other appeals is not factually true, given where we are in the district court. Thank you. With regards to the Ponzi presumption, Judge Brennan, yeah, I agree wholeheartedly that you've said it better than I could in terms of why the Ponzi presumption applies. Equity bill, the district court's opinion in Equity Bill 1, this court's opinion and discussion of the Ponzi scheme fits squarely within the law on why you have the Ponzi presumption. If this doesn't, if it's not applicable here, then you eliminate the Ponzi presumption at that point in time. And moreover, the court, as I just sort of talked about the jurisdictional basis here, the court, the district court has applied that same type of analysis to the other groups in its resolution. That has also been true with respect to the netting rule and to their challenge as to the limitation on the recovery of principle. In Equity Bill 1, that was the appeal. That was the distribution plan included those elements. It was affirmed. Distributions occurred consistent with the affirmance of that distribution plan. The district court, in dealing with other plans, has applied precisely the same rules when dealing with those limitations, the application of the netting rule, the Ponzi presumption, and the issue of the return, the limitation on the return of principle. So that same element here, not only has the court done that as part of EB1, but it's also consistent with the law in the Seventh Circuit. When you look at the appellant's position on this, they don't rely on Seventh Circuit authority. They don't look at wealth management. They don't look at the central sleep versus death decision. They don't look at EB in order to try and make their points as to why Seventh Circuit authority supports the lack of grounding that the district court had in its decision to limit the recovery to principle invested or in the application of the netting rule. When that is precisely, it fits squarely within that precedent that the court has done. In the case of wealth management, the court there used equitable subordination in its discretion to the district court to create a pro-rata distribution plan, ultimately to create a class of claimants that were similarly situated in order to basically meet the standard of equality equals equity. In the central sleep case, there the district court created a pro-rata plan expressly rejecting the application of interest, fees, and penalties of that nature affirmed by this court. Of course, in Equity Bill 1, the exact same type of distribution plan with those limitations was before this court affirmed distributions occurred consistent with that plan. As a result, they don't rely on Seventh Circuit authority. They have to go to the district court of Utah for their only authority on these questions, which is neither presidential, as the court well knows, nor is it apposite here. If anything, if one looks, for example, at the Jupiter case, which they rely on heavily, the court in that case actually used equitable principles to deny certain levels of interest that were being sought by the senior secured investors in that case. That was a special master decision that was ultimately adopted by the district court there. So they don't rely on this court's authority when they go ahead and try and suggest that the distribution plan should be disturbed. As counsel indicated, abusive discretion standard applies in this case. There's no evidence of an abuse of discretion. The findings of the fact have not, there's no record evidence to show that they're clearly erroneous or that there's no record upon which the courts have reached those rulings. Thank you, Mr. Rachels. Thank you very much. We ask for approval. Thank you. Mr. DeVault, we'll move back to you. We'll give you a little bit of extra time. We'll give you seven minutes on rebuttal. And, Mr. DeVault, if you could fold in some comments on appellate jurisdiction. Absolutely, Your Honor. Thank you very much for additional time. Just starting briefly, I think the most important takeaway from what we just heard from Appalese is that there was no attempt to address what is the framework of the law on diligent inquiry. The 2012 Illinois Appellate 120061, U.S. Bank versus Villareal, we're not making this up. It's a two-step process. And the second step, for the sake of all future investors, is about, and it's an objective standard. And there was no attempt to address or defend the three suppositions from the district court on page 32 and 35. Your Honors, in fact, the only real defense or attempt to defend that is pointing to additional evidence. And that was Mr. Kermanian's deposition. But, Your Honors, on pages 30 and 31 of his deposition, Mr. Nanbar explained that Mr. Kermanian was not someone he would have thought was an investor. Similarly, I don't want to waste the diligent inquiry point. We don't concede that, but it's not that nothing was done. What they're trying to do is take this initial step and push it over. And if you think he's a bad guy, he was asked about his Ponzi scheme, his deposition, Your Honor, that if you think he's a bad guy, you should just collapse the two steps. That's the crux of this case. They're still going to get their shot on fraudulent conveyance. But that second step for all future investors has to mean something, an objective standard. This court has said so in Bonded and in Brandt and First Independence for the Sixth Circuit. Obviously, Your Honor, you can have a fraud without it being a Ponzi scheme. Obviously. And our only point on that is just for future individual determination. But the idea that we're talking out of both sides of our mouth, we're absolutely not. We would refer, Your Honors, to the SEC complaint, to the receiver's lawsuits. All of these are this court's observations. All of these points demonstrate what everyone thinks about Mr. Namvar and wants to argue on fraudulent conveyance. On the objective standard, those three points, Equity Build was not going to give it up. And that's not me saying that. That's the SEC on the verge of collapse. They continue to lie to new investors. Your Honor, the last thing I want to say, though, on that point, on the steps they did take, just to show you how unique the situation is and that no objective inquiry would have found this, the law firm, and I hesitate, but Rock Fusco, the receiver sued Equity Build's law firm, the very lawyer, when Shattar learned that Yates had been purchased. They asked. They didn't sit on their hands. They asked for the closing statement and the insurance document. And, Your Honors, that's at 1537, page 250. And who was it that provided it? Equity Build's lawyers. The receiver's now suing them, accusing them, Your Honor, of, quote, for being intimately involved in creating the documentation necessary to advance Equity Build's various schemes. You have all of our contacts at Equity Build and their lawyers. Not us. The receiver, the appellee, has accused of committing and being a part of a fraud. Your Honor, to address the jurisdictional question, Your Honor, I do think that this court's analysis adopting the Fifth and Sixth Circuit, that the collateral order doctrine does apply. I do think that that's correct. I know that the concurrence raised that point. I agree with appellees. This is an important issue when you look at the factors. It is an issue that has been conclusively resolved. I think we come at it from different angles. From our perspective, we were very gratified the district court granted a stay for each of these as we appealed because otherwise the funds, in fact, would dissipate, right, pending the appeal. In other words, if we didn't get to appeal to the end but for that stay, we would have no chance of recovery. At least now in this appeal we have this interim step. But I think that the Fifth and Sixth and Seventh, I think it's the Ninth that disagrees. I understand there's that split, but I think that this court got it right in its first opinion on footnote two, saying that under the under-established precedent that this court has jurisdiction. And lastly, it's really important to me that this notion of going after Mr. Namvar, I mean, first of all, he paid his debt to society and it actually cuts against them. So he's supposedly this bad guy, this fraudster who knows all the angles in the Ponzi scheme. He himself got duped. These are his friends and family members that he brought their money into this. What incentive would he have? And that's setting aside reality just when it comes to Mr. Namvar. It's not fair if you want to talk about this is a situation that applied to hundreds of investors, including their clients, including my client. If Mr. Namvar himself got duped and it wasn't a matter of he was given follow-up information, and it's not fair that when he, under oath, tells the truth that he doesn't remember a conversation six years, seven months, and 15 days. If we were in a trial downstairs and someone said they perfectly remembered a conversation, a good AUSA would chop them to pieces if they said they remembered having that conversation. And there's a reason for that. So I just ask, Your Honors, if not for Mr. Namvar and Shattar, if for every investor in Illinois who in the future could be in this situation, yeah, they're on notice inquiry. But that means they're still entitled to an objective assessment based on the actual facts. And with that, Your Honors, I respectfully request that this court reverse and remand. Thank you. Thank you, Mr. DeVoe. Thank you, Mr. Stein. Thank you, Mr. Rachelis. The case will be taken under revisement.